# Exhibit 3

# DANEKER McINTIRE SCHUMM PRINCE GOLDSTEIN MANNING & WIDMANN, P.C.

One North Charles Street, Suite 2450
Baltimore, Maryland 21201
(410) 649-4747
Facsimile (410) 649-4758

*David B. Goldstein*
*Direct Dial (410) 649-4755*
*Brooke Schumm, III*
*Direct Dial (410) 649-4761*

August 26, 2002

Via Hand Delivery

The Honorable Marvin J. Garbis
United States District Judge
United States District Court for
    the District of Maryland
United States Courthouse
101 W. Lombard Street
Baltimore, Maryland 21201

　　　　　RE:　Michelle Trading Corporation v. Rony Natanzon,
　　　　　　　　Civil Action No.: MJG-02-1868

Dear Judge Garbis:

　　　　As your Honor knows, we represent Plaintiff and Counter-Defendant, Michelle Trading Corp., and the Third-Party Defendants, all of whom are referred to herein as "Buchbinder." The Defendant and Counter-Plaintiffs are referred to herein as "Natanzon."

　　　　As Your Honor also knows, on July 12, 2002, the parties in the referenced litigation negotiated a settlement and memorialized it in a "Memorandum of Understanding Re: Settlement Agreement" (the "MOU"), a copy of which is enclosed (to simplify reference to the MOU provisions herein and in the final written documents implementing the MOU and settlement, we have annotated the MOU by adding paragraph numbers in the left margin of the MOU). In that MOU, the parties agreed "to execute final written document(s) within 14 days consistent with this Memorandum of Understanding." MOU, at paragraph 16. In MOU paragraph 16, the parties also agreed to submit to Your Honor any irreconcilable disputes regarding the final written settlement document for a final, binding decision. The purpose of this letter is to submit such an irreconcilable dispute to Your Honor for a final, binding decision.

　　　　Consistent with the letter and spirit of the MOU, Buchbinder and Natanzon engaged in extensive good faith negotiations, including numerous telephone conference calls and

# DANEKER McINTIRE SCHUMM PRINCE GOLDSTEIN MANNING & WIDMANN, P.C.

August 26, 2002
Page 2

correspondence, in an attempt to reach agreement on final written documents. We also agreed to extend the deadline by which the final written agreement was to have been completed, but we have now reached an impasse as to certain issues relating to the contemplated final written agreement. Therefore, pursuant to paragraph 16 of the MOU, Buchbinder respectfully submits to Your Honor the following enclosed proposed "final written documents": (i) a Rider to Memorandum of Understanding and (ii) a Pledge and Escrow Agreement.

The original version of these documents was drafted by Buchbinder to implement the paragraph 16 provision for "final written documents." They were submitted to Natanzon and since have undergone numerous revisions during negotiations over the past few weeks. Therefore, while the originals of these enclosures represented the views of Buchbinder, much of their current text is the result of both parties' input. Further, it is also our understanding that there is general agreement by both Buchbinder and Natanzon with all of the provisions contained in these documents, EXCEPT FOR THE FOLLOWING ISSUES ON WHICH THE PARTIES ARE UNABLE TO AGREE:

>    A. With respect to Rider Section 6, Natanzon believes that: (i) the authority of Baron to sell the ERN Collateral is not effective until 90 days after July 12; (ii) the authority of Baron to sell the ERN Collateral is limited to the more valuable of (a) those merchant accounts generating $80,000 per month of residuals or (b) those merchant accounts in existence on July 12; and (iii) the right of Baron to receive the residual income from the ERN Collateral does not arise until 90 days after July 12.[1]
>
>    B. Natanzon objects to the waiver of a jury trial under Rider Section 13 and Escrow Section 9 (k).
>
>    C. We also believe that all parties agree that, if it is finally determined that Baron does not have the right either immediately to sell the ERN Collateral or immediately to receive the residual income, then Section 4 A (ii) of the Escrow Agreement will require modification.

With respect to the Rider Section 6, Buchbinder contends that the letter and spirit of the

---

[1] The Court will note that the Rider provides for Baron, not Michelle, to sell the portfolio, and for the proceeds to be applied to the Baron debt. It is the Buchbinder parties' understanding that the Natanzon parties agree to this change from the MOU for tax reasons.

# DANEKER McINTIRE SCHUMM PRINCE GOLDSTEIN MANNING & WIDMANN, P.C.

August 26, 2002
Page 3

parties' settlement negotiated and memorialized in the MOU provided for Baron to be able to sell the referenced Concord and CPS merchant account portfolio, *in toto*, at any time during the 90-day period, subject to Natanzon's consent, which was not to be unreasonably withheld. The "Concord and CPS merchant account portfolio" represents ERN's contract rights for the stream of fee income charged for merchant credit card processing services, essentially automated clearinghouse services for credit card transactions. For the Court's reference, we have attached copies of the underlying Concord and CPS merchant and processing services agreements, which were produced in discovery and bate stamped 0101-0107 and 0108-0118. The one contract, 0101-0107, is between ERN and National Payment Systems, Inc. d/b/a Card Payment Systems, abbreviated "CPS." The other contract, 0108-0118, is between ERN [misspelled "ECR/LLC"] and EFS National Bank, which is the merchant banking affiliate of Concord EFS, the publicly traded parent company routinely referred as "Concord." These agreements provide for ERN to exclusively sell the credit card processing rights to ERN's merchant accounts to the Concord entities, CPS or Concord EFS.[2] The term used in MOU, paragraph 2, "the prospective residual payments due from Concord and CPS, and the underlying portfolio of accounts," therefore, refers to the ERN merchant accounts and their stream of credit card transaction fees arising from the merchants' credit card transactions as serviced under the ERN - Concord/CPS service agreements. ERN also provides merchants with check guaranty services, so only the credit card processing right adhering in the ERN-merchant bundle of contract rights is involved in this settlement provision.

ERN contracted with Concord and CPS for the handling of these credit card processing services because ERN lacked the ability to clear merchant credit card transactions directly with

---

[2] In the course of discovery, it was learned that Natanzon is improperly diverting ERN business to his secret entity, TRN LLC, and also had contracted in the name of "TRN" with another credit card services company, First American Payment Systems, Inc. ("FAPS"), for clearing ERN/TRN merchant account credit card transactions. Natanzon's improper diversion of ERN/TRN merchant accounts to FAPS may constitute a breach of the Concord and CPS exclusivity provisions [see pages 0103 and 0112]. Because of the way the MOU is structured, Concord's possible termination of these contracts based on ERN's breach of its exclusivity agreement could render the portfolio worthless, causing Buchbinder to lose the ability to recover ERN's $2 million settlement payment. Thus, not only is Natanzon continuing to divert merchant accounts to TRN and FAPS, thereby reducing the value of the available "Concord" and "CPS" merchant accounts that could be sold to pay the $2 million ERN settlement payment, but Natanzon has also thereby risked the total loss of the portfolio value if the Concord entities were to terminate the contracts due to ERN's breach of contract.

# DANEKER McINTIRE SCHUMM PRINCE GOLDSTEIN MANNING & WIDMANN, P.C.

August 26, 2002
Page 4

the credit card companies. Only merchant banking entities like Concord are able to handle such credit card "clearing house" activities. Each such merchant credit card transaction gives rise to a charge which is deducted from the credit card transaction amount, and that charge is then split between the merchant bank (either Concord or CPS, whichever the case may be) and ERN. The sum of money represented by the ERN portion of the charge is called a "residual" and is so denominated in the MOU. As Your Honor will note in the MOU, paragraph 20, Natanzon represented that the residual stream, at that time, amounted to approximately $80,000 per month. However, Natanzon also noted that the portfolio was experiencing attrition on new and old accounts of approximately 1.5% per month.

During settlement discussions through the afternoon and evening of July 12, Natanzon unsuccessfully tried to raise the $2 million settlement payment by a loan. When he was not able to do that, Natanzon offered to allow Buchbinder to sell the Concord and CPS portfolio accounts. The offer of the right to sell the portfolio provided Buchbinder with "security" for the obligation in that it meant that Buchbinder could immediately sell the portfolio and raise substantial monies toward the $2 million, even if the portfolio sale would probably not cover the entire obligation. But, ERN would still have 90 days to try to raise the remainder of the settlement payment.

After this settlement agreement was negotiated and memorialized in the MOU, and after the MOU was signed by Buchbinder on the evening of July 12, and after Natanzon agreed to its terms subject to its final review by ERN's corporate counsel, Mr. Rombro, Natanzon became concerned that the portfolio sale would not net the $2 million necessary to discharge ERN's initial settlement obligation. So, Natanzon changed his mind, and on Saturday morning, July 13, we were so advised by Natanzon's counsel. Subsequently, we received the MOU executed by Natanzon, as modified with the addition of paragraph 20 on page 5 of the MOU. This is reflected in Natanzon's handwritten annotation on page 1 of the MOU referring to "page 5 attached as part of this agreement." In that page 5, paragraph 20, Natanzon substantively changed the settlement essentially to limit Buchbinder to the Concord and CPS portfolio for payment of the $2 million. Nevertheless, Buchbinder agreed to the MOU as modified.

In the MOU, as changed by Natanzon's Saturday morning addition, Natanzon offered and Buchbinder accepted the immediate assignment of the Concord and CPS merchant account portfolio along with the right immediately to sell the portfolio on behalf of ERN to satisfy the $2 million ERN settlement obligation set forth in MOU paragraph 2. There was never any discussion or agreement that the MOU's present tense assignment of the portfolio accounts to Buchbinder and present tense authorization of Buchbinder as ERN's agent to sell the portfolio was really just a future tense promise, not effective for 90 days. Indeed, Natanzon and his counsel were present at the settlement table when Buchbinder, before accepting Natanzon's offer

# DANEKER McINTIRE SCHUMM PRINCE
# GOLDSTEIN MANNING & WIDMANN, P.C.

August 26, 2002
Page 5

of the portfolio, made a telephone call to ascertain whether there would be any interest in the immediate purchase of the portfolio. Upon receiving a positive response, subject to due diligence review, the parties agreed on that provision of the settlement. Buchbinder did not agree, in addition to limiting his ultimate recourse for the $2 million payment solely to the portfolio and its residuals, to assume the risk of loss for an interim 90-day period. Indeed, Natanzon's present position that nothing was assigned to Buchbinder would render his own Saturday morning addition on page 5 meaningless. There, Natanzon wrote: "If the aforesaid sale does not occur and the residuals do not satisfy the obligation to pay the said two million dollars, the said two million dollars plus 8 per cent interest will be paid by CPS and Concord existing portfolio or residuals approximately 80 thousand dollars per month." The "aforesaid sale" is Buchbinder's right to receive the portfolio residual income and to sell the portfolio during the 90-day period in order to raise the cash for ERN's $2 million settlement payment set forth in MOU paragraph 2.

Now, however, Natanzon again seeks after-the-fact to change the settlement agreement so that for 90 days Buchbinder bears the full risk of a deterioration in the value of the portfolio. The risk is not insubstantial. Concord could discover Natanzon's improper diversion of merchant accounts to FAPS and terminate its agreements. The market for the sale of such merchant accounts could deteriorate in the worsening economic climate. The quality of the saleable portfolio of merchant accounts, which Natanzon admitted in the MOU loses approximately 1.5% of its accounts every month, could decline. Natanzon could accelerate his improper diversion of new merchant accounts to TRN and FAPS, thereby dramatically increasing the attrition ratio and decreasing the value of the remaining portfolio. Indeed, Natanzon now seeks to limit the portfolio only to the specific accounts existing on July 12, thereby accentuating the progressive devaluation of Buchbinder's only available means to pay the ERN settlement payment. With Natanzon's continuing diversion of business to FAPS and natural attrition, Your Honor can see how a 90-day delay could cause Buchbinder an enormous and irreparable loss.

In addition, Natanzon refuses to pay over any of the residuals until 90 days have passed. And, despite authorizing Buchbinder to sell the portfolio as ERN's agent, Natanzon has refused to disclose any information regarding the portfolio accounts or residuals so that they can be marketed and sold. Buchbinder has agreed to limit the portfolio sale to a portfolio for which a purchaser would pay $2 million, but presently Buchbinder does not believe that ERN has a Concord and CPS portfolio whose value approaches, much less exceeds, the value of $2 million. What Natanzon really seeks, again after-the-fact, is to further devalue the cost of the settlement to ERN by depriving Buchbinder of the promised portfolio and its income for 90 days, and to limit the saleable portfolio to whatever July 12 accounts may be left after the passage of 90 days. In the meantime, Natanzon continues to divert business away from ERN and its Concord service

# DANEKER McINTIRE SCHUMM PRINCE GOLDSTEIN MANNING & WIDMANN, P.C.

August 26, 2002
Page 6

agreements and towards TRN and its FAPS service agreement, all at Buchbinder's substantial risk.

The Buchbinder parties feel very strongly that the letter and spirit of the parties' settlement was that Natanzon agreed to allow Buchbinder during the 90-day period to sell the Concord and CPS portfolio, as it changed from time to time, to raise the cash necessary to make up the $2 million ERN settlement payment. There was never any discussion or agreement that Buchbinder would be limited to selling whatever remnant of the July 12 portfolio might still exist after the passage of 90 days. The parties agreed that the Court would retain jurisdiction during the 100-day period following July 12 so that the Court could resolve any issues that arose during this critical period leading up to the $2 million settlement payment. If Natanzon's view is correct, the process of selling the portfolio could not even be commenced until after the Court had divested itself of jurisdiction and the action had been dismissed, thereby defeating the purpose behind the parties' agreement to stay the case for 100 days.

In the same vein, the Buchbinder parties submit that Natanzon agreed to immediately pay over to Buchbinder the Concord and CPS portfolio residuals, which would be credited against the $2 million settlement payment owed by ERN. Again, the reason to pay over the residuals immediately pending the portfolio sale was that Natanzon had already failed during the settlement negotiations to obtain a loan commitment to fund the $2 million settlement payment, and ERN had no cash. The portfolio income was offered and accepted in partial satisfaction of the $2 million obligation because no other source of funds could be offered by Natanzon to satisfy the obligation. At no time did Natanzon ever suggest that the residuals would not begin to be paid to Buchbinder until after 90 days had passed. In fact, the MOU states expressly in paragraph 4 that "All residual payments shall be delivered directly to Michelle, and applied as a credit against the $2,000,000 due." The residuals cannot be paid and credited against the settlement payment if the 90 days has passed and the payment has already been made.

In summary, with respect to the right to sell the portfolio and to receive the residual income, Buchbinder believes the parties settlement memorialized in the MOU authorized Buchbinder immediately to market and sell the designated portfolio accounts as ERN's agent. Pending that sale, the portfolio residual income stream was to be paid directly to Buchbinder and applied as a credit against the ERN settlement payment. If Buchbinder could not arrange an acceptable sale within the 90-day period and ERN could not pay the $2 million, Buchbinder had the right to continue to receive the residual income, plus 8% interest on the outstanding obligation, until a portfolio sale and/or the residuals satisfied the obligation plus accrued interest. Since (after the Natanzon Saturday morning modification of the MOU) Buchbinder agreed to limit recourse for ERN's $2 million settlement payment to the portfolio sale and the residual

# DANEKER McINTIRE SCHUMM PRINCE GOLDSTEIN MANNING & WIDMANN, P.C.

August 26, 2002
Page 7

income, Buchbinder was free at any time to sell the portfolio for less and take the loss. Alternatively, Buchbinder could hold the portfolio and receive the residual income stream, cognizant of the risk of holding a variable asset and of the possible deterioration in the market for such accounts. Natanzon has no right to force Buchbinder to postpone the sale and the receipt of the residuals for 90 days, to arbitrarily limit the portfolio to its July 12 status, and to withhold all information regarding the portfolio in the meantime.

With respect to the jury trial waiver, it is the view of the Buchbinder parties that, since the underlying loan agreements between the parties contained jury trial waivers, the settlement agreement should similarly include a jury trial waiver. See attached copies of the Baron Loan and Security Agreement [at section 12.18], the Baron Revolving Line of Credit Note [at pages 2-3], and the Baron Term Note [at page 3]. The Buchbinder parties concede that no express jury trial waiver is part of the MOU.

Finally, the Buchbinder parties believe that once the Court determines the timing of the right of the Buchbinder parties to sell the portfolio and to receive the residual income, and the extent of the portfolio accounts that can be sold, the modification of Section 4 A (ii) of the Escrow can be accomplished by the parties.

The Buchbinder parties also note that time is of the essence. With each passing day, the value of the portfolio may decrease as merchants cancel their contracts with ERN, and as ERN is unable or unwilling (e.g., diversion of merchant accounts to TRN and FAPS) to replace such merchant accounts, or if Concord or CPS terminate their contract relationship with ERN. In each such case, Buchbinder's right to a $2 million settlement payment from ERN may be adversely and irreversibly affected. Therefore, the Buchbinder parties respectfully request the Court to render its decision on this dispute at its earliest opportunity. We are also prepared to provide the Court with testimony or argument on these issues on an expedited basis at the Court's convenience.

We note that we have tried to be very tolerant of and patient with Mr. Natanzon's conduct. However, it must be noted, for instance, that Mr. Natanzon is currently and has long been in default of the commitments he undertook in the MOU. For example, he has not transmitted the weekly account check register or bank statements as promised. He has refused all requests for information about the Concord and CPS merchant account portfolio. He has refused information about the amount of residuals, and has refused to remit the residuals directly to Buchbinder. In the face of Mr. Natanzon's flagrant settlement abuse, we respectfully ask Your Honor, pursuant to the parties' agreement, to intercede and protect the Buchbinder parties.

# DANEKER McINTIRE SCHUMM PRINCE GOLDSTEIN MANNING & WIDMANN, P.C.

August 26, 2002
Page 8

      Accordingly, Buchbinder asks Your Honor to approve the attached Rider and Escrow Agreement in their present form and to determine as follows:

1. That Buchbinder is free to sell, at any time, the Concord and CPS portfolio, as it is constituted from time to time, up to the value of $2 million.

2. That Natanzon/ERN is to provide Buchbinder and his entities all requested information regarding the Concord and CPS portfolio in order for same to be marketed and sold as per #1 above.

3. That Natanzon/ERN is immediately to direct that all residual income from the Concord and CPS portfolio be paid directly to Baron, to be applied as a credit against the $2 million ERN settlement payment, and Natanzon/ERN is to account for all residual income received from July 12 to the present and to immediately pay it over to Baron, also to be applied as a credit against the $2 million ERN settlement payment.

4. That the waiver of a Jury Trial provision in Rider Section 13 and Escrow Section 9 (k) is approved in its present form.

5. That Section 4 A (ii) of the Escrow Agreement is approved in its present form.

      We thank the Court in advance for considering this matter. If we can provide the Court with any additional information, please do not hesitate to contact us.

      We have provided copies of this letter and the attachments to counsel for the Natanzon Parties so that they may comment on the accuracy of our characterization of the status of the negotiations.

      We look forward to the Court's decision on these issues at the earliest possible time.

**DANEKER McINTIRE SCHUMM PRINCE
GOLDSTEIN MANNING & WIDMANN, P.C.**

August 26, 2002
Page 9

                                        Respectfully,

                                        */s/ David B. Goldstein*

                                        David B. Goldstein

DBG:fls
Enclosures
cc:    Paul Mark Sandler, Esquire
        Stuart R. Rombro, Esquire